The defendant The Security Title Guarantee Corporation of Baltimore ("Security Title"), a title insurance company, appeals a partial summary judgment in favor of the plaintiff GMFS, LLC. The partial summary judgment, which the trial court made appealable pursuant to Rule 54(b), Ala. R. Civ. P., struck Security Title's late-notice defense to GMFS's claim for breach of a policy of title insurance and awarded GMFS $31,641.49 on that claim. We affirm.
In September 2000, GMFS, a mortgage lender, loaned Robert Bounds, as interim financing, $180,000 to buy a house on Monterey Street in Mobile ("the house") from the estate of Cora Jacobs ("the estate") and to make repairs to the house. Bounds agreed to secure the loan with a first mortgage on the house. Without GMFS's knowledge, the estate agreed to loan Bounds $25,000 of the $180,000 he was to pay for the house, and Bounds agreed to secure that loan with a second mortgage on the house. South Alabama Professional Title Service, Inc. ("SAPTS"), an agent of Security Title, acting through its principal, Richard Sawyer, closed both loans on September 21, 2000. Indeed, Sawyer notarized Bounds's signature on both mortgages. GMFS's first mortgage was recorded in the probate court on September 21. The estate's second mortgage was recorded on September 25.
The agency agreement between Security Title and SAPTS expressly authorized SAPTS to issue commitments to insure (often called "title binders") and policies on behalf of Security Title. Pursuant to that authority, SAPTS issued a policy insuring the priority of GMFS's September 21 mortgage on behalf of Security Title. However, Sawyer admits that, although he had actual knowledge of the estate's mortgage from its inception, the policy did not disclose to GMFS the existence of the estate's mortgage.
Because the note secured by the GMFS mortgage provided that it would mature on December 1, 2000, Bounds applied to GMFS for a 30-year loan, and GMFS agreed to make that loan. The loan agreement contemplated that the proceeds of the 30-year loan would be used to pay off the debt secured by GMFS's September 21 mortgage and that Bounds would secure *Page 789 
the 30-year loan with another first mortgage on the house. SAPTS closed the 30-year loan on November 30, 2000, and the proceeds of that loan were used to pay off the debt secured by GMFS's September 21 mortgage. At the November 30 closing, Bounds executed another mortgage to secure the payment of the November 30 loan. Although Sawyer had actual knowledge of the estate's mortgage, SAPTS did not obtain a subordination of the estate's mortgage to GMFS's November 30 mortgage. On behalf of Security Title, SAPTS issued a commitment to insure the priority of GMFS's November 30 mortgage. The agency agreement between Security Title and SAPTS required SAPTS to conduct a title examination on the house before issuing that commitment to insure. However, neither that commitment to insure nor any other communication from SAPTS disclosed to GMFS the existence of the estate's mortgage. Sawyer admits that SAPTS should have disclosed to GMFS the existence of the estate's mortgage.
Moreover, neither SAPTS nor Security Title delivered the title policy insuring GMFS's November 30 mortgage to GMFS. (SAPTS's attorney eventually produced the policy on February 4, 2003, in a deposition conducted during the discovery phase of this lawsuit.)
After executing GMFS's November 30 mortgage and the note it secured, Bounds defaulted on the note, and GMFS subsequently employed attorney Goodman Ledyard to foreclose that mortgage. Ledyard scheduled the foreclosure sale for June 5, 2001. In May 2001, Ledyard received a pre-foreclosure title report from another title insurance company that revealed the existence of the estate's mortgage. A few days before GMFS's June 5 foreclosure sale, Ledyard spoke to Michael Druhan, one of the co-executors of the estate who was also an attorney. Druhan told Ledyard that the estate's mortgage had priority over GMFS's November 30 mortgage and that GMFS's September 21 mortgage was due to be cancelled because it had been paid in full with the proceeds of the November 30 loan.
GMFS foreclosed its November 30 mortgage on June 5, 2001. On July 19, 2001, GMFS received a letter from Jason Hagmaier, an attorney representing the estate, notifying GMFS that the estate would foreclose its mortgage on August 17, 2001. On July 19, 2001, an SAPTS employee wrote this message to Sawyer regarding a telephone call received from a GMFS employee:
"Title work done 11/27/00
[Commitment to Insure] TI-00-791 — 11/30/00
Robert Bounds
 Letter from Jason Hackmeyer (sic)[,] atty for Cora M. Jacobs [estate,] 2nd mtg was rec'd Sept 30th and was not on title commit."
(C. 935.)
Before the estate foreclosed its mortgage on August 17, GMFS requested that SAPTS and Security Title provide it with the title policy insuring the November 30 mortgage; however, neither did so. After the estate's foreclosure sale, GMFS submitted a claim to Security Title. However, Security Title asserted that GMFS had not given Security Title prompt notice of the estate's mortgage. Paragraph 3 of the "Conditions and Stipulations" section of the policy insuring the November 30 mortgage required GMFS to give Security Title prompt notice of "any claim of title or interest which is adverse to . . . the lien of the insured mortgage." (C. 951.) Asserting that GMFS had not complied with that policy requirement, Security Title declined to pay GMFS any amount in excess of $31,641.49, the amount that would have been necessary to pay off the estate's *Page 790 
mortgage before the estate conducted its foreclosure sale.
GMFS then sued Security Title for, among other things, breach of the title policy insuring the November 30 mortgage (i.e., breach of contract). GMFS also sued SAPTS and Sawyer for, among other things, negligence in their performance of the title search and issuance of the commitment to insure the priority of GMFS's November 30 mortgage.[1]
Security Title answered and admitted that it had insured the priority of GMFS's November 30 mortgage and that its commitment to insure that mortgage did not disclose the existence of the estate's mortgage. However, as an affirmative defense, Security Title asserted that, because GMFS had not notified Security Title of the estate's mortgage before the estate's foreclosure sale, GMFS had not given Security Title the timely notice required by the policy. Security Title also cross-claimed against SAPTS and other defendants.
Thereafter, GMFS moved for a partial summary judgment against Security Title on its breach-of-contract claim and against SAPTS and Sawyer on its negligence claims. In support of its motion, GMFS submitted evidentiary materials and a supporting brief. Security Title submitted evidentiary materials and a brief in opposition to GMFS's motion. The trial court denied the partial-summary-judgment motion. Subsequently, after the completion of additional discovery, GMFS renewed its motion for a partial summary judgment against Security Title, SAPTS, and Sawyer, and it submitted additional evidentiary materials. Security Title submitted additional evidentiary materials and another brief in opposition to the renewed motion for a partial summary judgment. Following a hearing, the trial court entered a written judgment granting GMFS partial summary judgments against Security Title, SAPTS, and Sawyer.[2]
Citing § 27-14-19(a), Ala. Code 1975, and Brown Machine Works Supply Co. v. Insurance Co. of North America, 659 So.2d 51 (Ala. 1995), the trial court held that Security Title was estopped from asserting that GMFS did not give it timely notice of the estate's mortgage because Security Title did not deliver the title policy to GMFS within a reasonable period of time after its issuance. Section 27-14-19(a) provides that, "[s]ubject to the insurer's requirements as to payment of premium, every policy shall be mailed or delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance, except where a condition required by the insurer has not been met by the insured." In Brown Machine Works, our supreme court, in answering a certified question from a federal court, stated:
 "We hold that § 27-14-19 requires that the insurance policy be `mailed or delivered' to the purchaser of a policy and to the named insured, and that an insurer may be estopped from asserting conditions of, or exclusions from, coverage where such a purchaser or insured is prejudiced by the insurer's failure to comply with the statute."
659 So.2d at 61.
Alternatively, the trial court held that, because SAPTS was Security Title's agent, § 8-2-8, Ala. Code 1975, imputed to Security Title all of SAPTS's knowledge regarding *Page 791 
the estate's mortgage and GMFS's July 19, 2001, telephone message regarding that mortgage. Section 8-2-8 provides that the knowledge of an agent is imputed to his principal. The trial court found that SAPTS was a general agent of Security Title because it had authority to bind coverage on behalf of Security Title. However, the trial court held that § 8-2-8 imputed to Security Title all of SAPTS's knowledge regarding the estate's mortgage and GMFS's July 19, 2001, telephone message even if SAPTS was only a soliciting agent of Security Title.
Finally, the trial court held that GMFS was entitled to recover at least $31,641.49 on its breach-of-contract claim because Robert Schapiro, Security Title's senior vice president and its designated representative pursuant to Rule 30(b)(6), Ala. R. Civ. P., who is also an attorney, admitted in his deposition that Security Title owed GMFS at least that sum under its policy.
Security Title moved the trial court to "reconsider" the entry of the partial summary judgment, and the trial court denied that motion. Security Title then moved the trial court to make the partial summary judgment appealable pursuant to Rule 54(b), Ala. R. Civ. P., and the trial court did so. Security Title appealed to the supreme court, and the supreme court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala. Code 1975.
 "In reviewing a summary judgment, an appellate court, de novo, applies the same standard as the trial court. Dobbs[v. Shelby County Econ. Indus. Dev. Auth., 749 So.2d 425 (Ala. 1999)]."
Bruce v. Cole, 854 So.2d 47, 54 (Ala. 2003).
On appeal, Security Title argues that the trial court erred in holding that Security Title's failure to deliver the policy estopped it from asserting its late-notice defense because, Security Title says, its obligation to deliver the policy to GMFS was subject to a condition precedent that GMFS did not perform until after GMFS had already notified SAPTS of the estate's mortgage. Specifically, Security Title argues that section II, paragraph C.6 of the commitment to insure the November 30 mortgage provided that GMFS's cancellation of its September 21 mortgage was a condition precedent to Security Title's obligation to deliver the title insurance policy insuring GMFS's November 30 mortgage. However, the language of that provision does not support Security Title's argument. It provides:
 "II. Schedule B of the policy to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of [Security Title]:
". . . .
"C. Special exceptions:
". . . .
 6. A closed end mortgage in the amount of $180,000.00 [sic] to GMFS, LLC, dated September 21, 2000 and filed September 21, 2000 and recorded in Real Property Book 4881, and page 1673."
(C. 570.) This provision does not provide that GMFS's cancellation of its September 21 mortgage is a condition precedent to the issuance of the policy insuring the November 30 mortgage. Instead, it provides that the issued policy will list GMFS's September 21 mortgage as an exception to coverage unless GMFS cancels its September 21 mortgage before the policy is issued. Consequently, we cannot reverse the partial summary judgment on the ground that GMFS had not performed a condition precedent to delivery of the policy.
Security Title also argues that the trial court erred in holding that Security Title's failure to deliver the policy estopped *Page 792 
it from asserting its late-notice defense because, it says, GMFS did not establish that Security Title's failure to deliver the policy prejudiced GMFS. GMFS argues that Security Title's failure to deliver the policy prejudiced GMFS because GMFS, believing that it was required to produce the policy when it submitted its claim, delayed submitting its claim while it attempted to obtain a copy of the policy from SAPTS and Security Title. However, we do not need to decide whether GMFS was prejudiced by Security Title's failure to deliver the policy in order to affirm the partial summary judgment. Even if GMFS was not prejudiced by Security Title's failure to deliver the policy, § 8-2-8 imputed to Security Title all of SAPTS's knowledge as of November 30, 2000, regarding the existence of the estate's mortgage, the payment of the debt secured by GMFS's September 21 mortgage with the proceeds of the November 30 loan, and the failure of SAPTS to obtain a subordination of the estate's mortgage to GMFS's November 30 mortgage. Thus, Security Title's imputed knowledge of the facts known to SAPTS supplied Security Title with timely notice of the estate's "claim of title or interest which is adverse to . . . the lien of the insured mortgage." (C. 951.)
Section 8-2-8 provides:
 "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of and ought in good faith and the exercise of ordinary care and diligence to communicate to the other."
Although Security Title argues that the trial court erred in holding that, as a matter of law, SAPTS was Security Title's general agent, that holding was not necessary to the partial summary judgment because the trial court correctly held that §8-2-8 imputed SAPTS's knowledge to Security Title even if SAPTS was not a general agent of Security Title.
First, the language of § 8-2-8 does not restrict its application to general agents. Second, in National Security Fire Casualty Co. v. Coshatt, 690 So.2d 391, 393 (Ala.Civ.App. 1996), this court applied § 8-2-8 to impute the knowledge of an insurance agent who was not a general agent to his insurance-company principal. In that case, the Coshatts, whose house was insured by National Security, informed their local National Security agent that a snow storm had damaged their home. The local agent told the Coshatts to make repairs. National Security later denied the Coshatts' claim. The Coshatts then sued National Security for breach of contract and bad faith. At trial, the court directed a verdict for the Coshatts on the issue of National Security's liability for breach of contract. On appeal, National Security argued that the trial court erred in directing a verdict on that issue for the Coshatts because, National Security said, the Coshatts had not given National Security timely notice of their loss. Despite the absence of any evidence or argument that the local National Security agent was a general agent of National Security, this court stated:
 "The gist of National Security's first argument is that the Coshatts did not give National Security proper notice so as to allow National Security to inspect the property before the damage was repaired. This argument fails to recognize the undisputed evidence establishing that Barber, the National Security agent, was notified of the damage at least four days before the Coshatts began repairs. Notice to the company's agent is notice to the company.
 "`As against a principal, both principal and agent are deemed to have notice of whatever either has notice of *Page 793 
and ought in good faith and the exercise of ordinary care and diligence to communicate to the other.'
"Ala. Code 1975, § 8-2-8.
 "The testimony of other National Security employees indicating that Barber did not communicate the notice to them does not create a question of fact as to whether the company received notice. . . ."
690 So.2d at 393.
Security Title attempts to distinguish Coshatt on the ground that the local agent in that case had authority to review and approve repairs to property following a loss, while SAPTS and Sawyer did not have any authority to adjust claims on behalf of Security Title. However, SAPTS did have express authority to receive notice of claims and to notify Security Title of those claims. Section 3 of Article VI of the agency agreement between SAPTS and Security Title provides:
 "Section 3. In the event of any claim made to Agent [SAPTS] under any commitment or policy issued by Agent on behalf of Security [Title] or if Agent becomes aware of any circumstances which may give rise to such a claim, Agent shall immediately notify Security [Title] in writing. Agent shall not adjust, compromise or settle any such claim, unless specifically authorized by Security [Title] in writing. Agent further agrees to cooperate with and assist Security [Title] in the prompt resolution of any such claim."
(C. 675) (emphasis added). Accordingly, the holding in Coshatt
that "[n]otice to the company's agent is notice to the company,"690 So.2d at 393, even in the absence of any evidence that the agent is a general agent, applies to the case now before us. SAPTS's knowledge on November 30, 2000, regarding the existence of the estate's mortgage, the payment of the debt secured by GMFS's September 21 mortgage, and the absence of a subordination of the estate's mortgage to GMFS's November 30 mortgage is imputed to Security Title by § 8-2-8 regardless of whether SAPTS was a general agent of Security Title.
Security Title next argues that, because § 8-2-8 limits the notice that is imputed to a principal to notice of information that the agent "ought in good faith and the exercise of ordinary care and diligence to communicate to the [principal]," the trial court erred in holding that Sawyer and SAPTS's knowledge of the estate's mortgage was imputed to Security Title. Specifically, Security Title argues that the question whether Sawyer and SAPTS ought, in "the exercise of ordinary care and diligence," to have communicated their knowledge of the existence of the estate's mortgage to Security Title is a fact question that a jury should resolve. However, Security Title did not make this argument to the trial court. "This court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court." Andrewsv. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992). Moreover, "on an appeal from a summary judgment, this Court cannot hold the trial court in error on the basis of arguments made for the first time on appeal." Ex parte Elba Gen. Hosp. Nursing Home, Inc.,828 So.2d 308, 312 (Ala. 2001). Therefore, we cannot reverse the partial summary judgment on the basis of this argument.
Security Title next argues that the trial court erred in imputing to Security Title notice of the estate's claim of an interest adverse to GMFS's November 30 mortgage on the basis of the July 19, 2001, telephone message left for Sawyer by a GMFS employee. Security Title argues *Page 794 
that the import of that telephone message is subject to interpretation. However, Security Title does not cite any legal authority in support of this argument. "When a litigant fails to support his argument with proper authority, we have no choice but to affirm." Pierce v. Helka, 634 So.2d 1031, 1033 (Ala.Civ.App. 1994). Moreover, because SAPTS knew on November 30, 2000, that the estate's mortgage existed, that the proceeds of the November 30 loan paid the debt secured by GMFS's September 21 mortgage, and that SAPTS had not obtained a subordination of the estate's mortgage to GMFS's November 30 mortgage, SAPTS was on notice on November 30, 2000, of the estate's "claim of title or interest which is adverse to . . . the lien of the insured mortgage." (C. 951.) Therefore, Security Title was on timely notice of the estate's mortgage regardless of what information is imputed to it on the basis of the July 19, 2001, telephone message.
Finally, Security Title argues that the trial court erred in awarding GMFS the sum of $31,641.49 because, Security Title says, GMFS's bid of $145,619.33 for the house at its June 5, 2001, foreclosure sale established the maximum amount of Security Title's liability under the title policy and GMFS's recovery of a total of $122,961.23 through pro tanto settlements with other defendants has reduced that liability to less than $31,641.49 ($145,619.33 minus $122,961.23 equals $22,658.10). However, Security Title does not cite any legal authority for the proposition that GMFS's bid of $145,619.33 established the maximum amount of Security Title's liability under the title policy. Moreover, Security Title does not cite any legal authority for the proposition that GMFS's recoveries from other defendants on other causes of action reduce Security Title's liability for breach of the title policy. "When a litigant fails to support his argument with proper authority, we have no choice but to affirm." Pierce, 634 So.2d at 1033.
 Conclusion
We affirm the partial summary judgment entered by the trial court in favor of GMFS and against Security Title.
AFFIRMED.
CRAWLEY, P.J., concurs.
THOMPSON, PITTMAN, and MURDOCK, JJ., concur in the result, without writing.
[1] In addition, GMFS sued, among others, the estate and the appraiser who appraised the house for Bounds for various torts. GMFS has settled with the estate and the appraiser on a pro tanto basis.
[2] Neither SAPTS nor Sawyer have appealed the partial summary judgements against them.